No. 39,337

POTTAWATOMIE AIRPORT AND FLYING SERVICE, INC., *Appellee*, v. MARION WINGER and WILLIAM HAUSERMAN, JR., MARION WINGER, *Appellant*.

(271 P. 2d 754)

Opinion filed June 12, 1954.

*C. Harold Hughes,* of Manhattan, argued the cause, and *Alvin R. Springer* and *Richard D. Rogers,* both of Manhattan, were with him on the briefs for appellant.

*Charles S. Arthur,* of Manhattan, argued the cause, and *Charles D. Green,* of Manhattan, was with him on the briefs for appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This is an action for damages to an airplane loaned by plaintiff to the appellant Winger to fly from Manhattan to Clay Center which plane was seriously damaged on the trip alleged to have resulted from the negligence of defendant. After the pleadings were filed the parties waived a trial by jury and the case was tried by the court resulting in a judgment for plaintiff. Defendant has appealed.

After the evidence was in and briefs furnished and considered the court filed its memorandum opinion which tells the story of the case as follows:

"The evidence in this case discloses that on the 25th day of May, 1951, plaintiff was the owner and in possession of a 1951 Piper-Pacer, MC7605K, Serial No. 20-420, 4-place, Lycoming, 125 horsepower engine.

"That on said day defendant, Marion Winger's personal airplane was undergoing repairs at Woods Airport, Clay Center, Kansas. That said defendant was anxious to ascertain how the repair job on his said personal airplane was progressing; and on said day requested from plaintiff the use of its said

Piper-Pacer 125 in order that defendant Winger could fly to Clay Center and look at his plane. That plaintiff, through its duly elected officer, Lloyd Henderson, did grant said permission to defendant as requested; that no contract of rental was entered into and no rental was to be charged, nor was charged.

"That defendant, Marion Winger, took the plaintiff's airplane and flew to Clay Center, Kansas, from plaintiff's airport on Highway 24 and 40 east of Manhattan, Kansas. That defendant, Marion Winger, and William Hauserman, Jr., sat side by side behind dual controls in said airplane that a down wind landing was made at the Woods Airport in Clay Center, Kansas, and the plane was badly damaged.

"The court finds as follows:

"1. Defendant Winger was the bailee in this transaction.

"2. The bailment was for the sole benefit of the bailee.

"3. Defendant Winger was a minor under the age of 21 years, to-wit: of the age of 20 years, 8 months, and 2 days, and was unmarried, on the 25th day of May, 1951, the date the airplane was damaged.

"4. The airplane, subject of the bailment, was returned to plaintiff in a damaged condition.

"5. Defendant Winger was negligent, in fact, the evidence discloses he failed to exercise ordinary care and diligence under the circumstances, notwithstanding the fact he was charged with the exercise of a high degree of care.

"6. Plaintiff had good reasons to believe defendant capable of contracting and was misled by defendant Winger's implied misrepresentations as to his age, and from his having engaged in business and handled his business affairs as an adult.

"7. The bailment contract cannot be disaffirmed by defendant Winger as the defense of infancy is not here available.

"8. The airplane was damaged to the extent of $3,900.00.

"9. Plaintiff should have judgment against defendant Winger for $3,900.00 and for the costs of this action."

A journal entry in harmony with this opinion was filed in which the court rendered judgment for plaintiff for $3,900.00 and costs of the action. The defendant Winger filed a motion for a new trial on the grounds: (1) Erroneous rulings or instructions (*sic*) of the court; (2) that the verdict (*sic*), report (*sic*) or decision is in whole or in part contrary to the evidence. This motion was duly considered by the court and overruled.

Counsel for appellant Winger in their brief in this court have not complied with our rule No. 6 (3) (b), pertaining to briefs by setting out, "A statement of the question involved, or separately numbered statements of the several questions involved, in very brief and very general terms, to enable the court to acquire immediate comprehension of the nature of the controversy." However, from the running discussion in appellant's brief we understand that appellant makes two main contentions. First, that the evidence does not

disclose that the plane was damaged by appellant's negligence; and second, that his request to borrow the plane and the loan of it by plaintiff constituted a contract which he could disaffirm because of his minority, and that he did disaffirm the contract after the damage to the plane and before the filing of this action.

Before answering these questions a general statement should be made. Plaintiff is a corporation; Lloyd Henderson, a licensed pilot who had 15 years flying experience, is its president and general manager; all of the stock is family owned; it operates an airport on the city limits of Manhattan where it conducts a flying service; it has hangar space for 15 airplanes, one and sometimes two being leased by students; it rents the hangar space, sells gas and oil and accessories but has no facilities for the repair of damaged planes.

Charles A. Wood, an airplane mechanic, operates Woods Airport at Clay Center. It has a north-south runway 1,300 feet long, and others. Wood had tools and facilities for repairing airplanes. He testified he had been an airplane mechanic for 22 years and at the time of the trial was employed at Boeing Aircraft at Wichita in the engineering department checking blueprints and revisions; that he had been a pilot for 22 years and holds an official position, that of maintenance aircraft inspector, with the Civil Aeronautics Administration.

William J. Hauserman, Jr., was made a party defendant and was served with a summons; he did not file an answer and no defense was made for him. He was called into military service on January 3, 1952. The day before he was ordered to leave his deposition was taken by plaintiff at Junction City and later introduced in evidence. At the trial which began December 1, 1952, plaintiff did not seek judgment against him.

Winger kept his plane, a Cessna 140, at plaintiff's airport for nine months prior to May 25, 1951. On a previous occasion he had taken the plane to Woods Airport in Clay Center for repairs, flying it there himself. About May 20, 1951, Winger told Henderson that he was going to have to have his plane overhauled; they agreed to send it to Woods Airport at Clay Center; Winger flew it over there. Woods told Winger that when the repair work was done he would notify him or Henderson.

On the afternoon of May 25, 1951, Winger drove to plaintiff's airport with Hauserman to see Mr. Henderson. Hauserman stayed in the car; Winger went and talked to Henderson who was there

doing some work; Winger told Henderson he wanted to go to Clay Center and see about the progress of the work on his plane. Neither of them had been notified that the repairs had been completed. Winger asked permission to use plaintiff's 1950 Piper-Pacer and go to Clay Center and plaintiff consented. Winger and Hauserman proceeded to the location of the airplane and taxied out for a normal take-off. The plane had dual controls and could be operated from either seat. When they started to get into the plane Hauserman, who had no pilot's license but some training for one, suggested that Winger get into the seat on the left side of the plane where the pilot normally sits but Winger told Hauserman to get in that seat and he got in the seat on the right-hand side of the plane. There is some conflicting evidence as to who flew the plane. Winger testified that he never touched the controls but Hauserman testified that he thought Winger flew it a part of the time for he definitely remembered that Winger spoke about how nicely it handled. When the plane reached Clay Center the wind was blowing from the north at about 25 miles an hour; the windsock at the airport was in order and was so extended that it indicated a rather strong wind from the north. Notwithstanding this the plane was flown so as to come into the runway from the north at a speed of about 60 to 70 miles an hour. This, with the wind, made it impossible for them to stop the airplane on the runway. The result of that was they ran through a wire fence to a short distance south of the runway, Mr. Wood testified they ran through 3 fences, and the plane turned over. Neither of the occupants were seriously injured but the plane was severely damaged, so much so that it was thought it was not worth-while to try to repair it. There is testimony it was worth $5,000.00 to $5,400.00 prior to its damage and $1,000.00 afterwards. The wreckage was sold for $1,000.00. Defendants offered no testimony respecting the damage of the plane. There is no contention now that the judgment of $3,900.00 is excessive. Soon after the plane was damaged Winger called Henderson and told him he had a nose-over. Henderson promptly went to Clay Center in another plane. When Henderson reached there Winger told him, "That it would be the last time he borrowed anybody's airplane to fly." Winger said that he would repair the plane and suggested that Henderson telephone Wichita to see what it would cost ,to repair it. It is not disclosed whether that was done. Winger offered to pay Henderson $1,500.00, or one-half, if Hauserman would pay

the other half of the repairs. It appears these suggestions were not accepted. The next day Winger told Henderson he would not pay anything because he was a minor. It appears that in the meantime he had talked to his father in Johnson or to an attorney there.

Reverting to the questions presented here; first, whether Winger was guilty of any negligence. It is argued that Hauserman was flying the plane and that he was responsible for the negligence. This was Winger's trip, not Hauserman's. Winger had a pilot's license to fly a plane, Hauserman did not. It was Winger who told Hauserman to get in the pilot's seat. There was an abundance of testimony that it is dangerous and decidedly careless to attempt to land a plane with the wind; that it should be landed against the wind, that this is one of the first things that is told to a person who is taught to fly an airplane. Winger is the man who borrowed the plane; he had a duty of his own to see that it was not landed contrary to proper flying methods and not in a way that was decidedly dangerous. This point raised by appellant has no merit. The trial court correctly found, "Defendant Winger was negligent, in fact, the evidence discloses he failed to exercise ordinary care and diligence under the circumstances notwithstanding the fact he was charged with the exercise of a high degree of care." We think the trial court also correctly found defendant Winger was a bailee in this transaction and that the bailment was for his sole benefit.

Appellant's next and principal contention is that he was not bound by his bailment contract resulting from his borrowing the plane for his own use because he was a minor. The evidence discloses that the court found that on the day of this tragedy Winger was of the age of 20 years, 8 months and 2 days. He had therefore not reached his majority. G. S. 1949, 38-101. Two other sections of our statute need to be quoted: G. S. 1949, 38-102 reads:

"A minor is bound not only by contracts for necessaries, but also by his other contracts, unless he disaffirms them within a reasonable time after he attains his majority, and restores to the other party all money or property received by him by virtue of the contract and remaining within his control at any time after his attaining his majority."

It may be conceded that his contract of bailment here was not a necessity. Probably he could have telephoned Mr. Wood and found out the progress of the repairs on his plane. Perhaps his notice to disaffirm was sufficient but he did not restore to the other party the property he received. Perhaps his answer to that would be

there was nothing to restore although he destroyed property of the value of $3,900.00 and at first agreed to pay it.

The next pertinent section, G. S. 1949, 38-103, reads:

"No contract can be thus disaffirmed in cases where, on account of the minor's own misrepresentations as to his majority, or from his having engaged in business as an adult, the other party had good reasons to believe the minor capable of contracting."

This defense of minority was raised in his answer. Defendant alleged that he was a minor of the age of 20 years on the 25th day of May, 1951, and that he attained his majority on the 23d day of September, 1951, and disaffirmed any contract, either express or implied, that might exist between him and plaintiff. Plaintiff in its reply states:

"That if the defendant was a minor on the 25th day of May, 1951, such fact was unknown to this plaintiff; that defendant, Marion Winger, engaged in business as an adult, and plaintiff had good reason to believe the defendant, Marion Winger, to be of contracting age. That by implied misrepresentations, from defendant having engaged in business as an adult, he is bound by his contracts and torts arising out of contracts either express or implied."

On this point plaintiff's evidence disclosed: That appellant Winger was a senior at Kansas State College; that he carried a bank account of his own since he had been in college, even before that when he was in high school; that he engaged in farming and cattle business with his father and received one-fourth of the net proceeds of the business; that he once told Mr. Henderson he was farming 300 acres of wheat; that he had purchased two automobiles from Ralph Stubblefield, an automobile dealer in Manhattan, one in 1949 and the other in 1950, in each case giving his personal check and taking title in his own name; that he also bought a Cessna 140 airplane. For nine months he had rented a hangar for his plane from plaintiff and purchased oil and gas and had some other expense connected with his plane; that he gave his personal check twice a month to plaintiff for such charges which checks had always been honored; that he never told Henderson that he was a minor; that he looked and acted like a young man who had reached his majority, and Henderson believed him to be of mature age and transacted business with him as such for nine months. None of this evidence was controverted.

Clarence Winger testified that his son, Marion Winger, was a student associated with him in business; that he gives the boys a

share of the wheat, and on the cattle business each takes a fourth; the boys do the work.

During the trial attempt was made on defendant's behalf to show that Henderson had seen a doctor's report of a physical examination of him in connection with some of the papers filed which authorized a pilot's license be given him which gave his birth date. Henderson testified that while he had seen a doctor's medical report it was not a paper that he was required to pass upon. In fact, he did not examine or pay attention to its contents. If this evidence was of any value it could amount to nothing more than conflicting evidence as to Henderson's knowledge of Winger's age. It was for the trial court to determine what weight, if any, it should have. With respect to this phase of the question the trial court, after considering all evidence pertaining thereto, found:

"Plaintiff had good reasons to believe defendant capable of contracting and was misled by defendant Winger's implied misrepresentations as to his age, and from his having engaged in business and handled his business affairs as an adult."

There is ample evidence to sustain this finding.

We have considered all the arguments of counsel and examined all authorities cited and find no error in the record. The judgment of the trial court is affirmed.